http://www.va.gov/vetapp16/Files3/1626428.txt

Citation Nr: 1626428 
Decision Date: 06/30/16 Archive Date: 07/11/16

DOCKET NO. 08-37 656 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Seattle, Washington

THE ISSUES

1. Entitlement to service connection for sleep apnea, to include as secondary to service-connected idiopathic central nervous system hyper-somnolence syndrome.

2. Entitlement to an increased rating for idiopathic central nervous system hyper-somnolence syndrome (hypersomnia), rated 60 percent to March 24, 2014, and rated 80 percent as of March 24, 2014.

3. Entitlement to a total disability rating based on individual unemployability due to service-connected disabilities (TDIU). 

REPRESENTATION

Appellant represented by: Robert V. Chisholm, Attorney

WITNESSES AT HEARING ON APPEAL

Appellant

ATTORNEY FOR THE BOARD

Zi-Heng Zhu, Associate Counsel

INTRODUCTION

The Veteran served on active duty from August 1984 to March 1991. 

These matters come before the Board of Veterans' Appeals (Board) on appeal from a December 2006 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Seattle, Washington, which reduced the rating for service-connected hypersomnia from 60 percent 20 percent, effective March 1, 2007. 

In a January 2011 decision, the Board found that the reduction was improper, and restored the 60 percent rating, but denied an increased rating in excess of 60 percent. The Veteran appealed that denial to the United States Court of Appeals for Veterans Claims, and in a May 2012 Memorandum Decision, the Court vacated and remanded the denial of the claim for increased rating. 

In a March 2013 decision, the Board found that the reduction of the rating for hypersomnia was not proper, and denied a rating in excess of 60 percent for hypersomnia. The Board also remanded the issues of entitlement to service connection for sleep apnea and TDIU.

The Veteran appealed the Board's 2013 decision with regard to the denial of an increased rating to the Court, which subsequently, in an August 2013 Joint Motion for Partial Remand, vacated the part of the Board's decision that denied an increased rating for hypersomnia and remanded the matter to the Board for action. The Board subsequently remanded the matter for further development consistent with Joint Motion for Remand.

A January 2016 rating decision assigned increased rating for hypersomnia of 80 percent as of March 24, 2014. That rating is not considered a full grant of benefits sought. Thus, the claim for increased rating remains on appeal. AB v. Brown, 6 Vet. App. 35 (1993).

The issue of entitlement to service connection for sleep apnea is REMANDED to the Agency of Original Jurisdiction.

FINDINGS OF FACT

1. For the entire appeals period, the Veteran's idiopathic central nervous system hypersomnolence syndrome has been manifested by, on average, 10 minor attacks of narcolepsy or hypersomnia per week, without convulsions.

2. The Veteran is currently gainfully employed full-time as an airplane mechanic. 

3. The Veteran's current employment is substantially gainful and not considered menial or a sheltered workplace. 

CONCLUSIONS OF LAW

1. The criteria for an increased rating of 80 percent, but not higher, for hypersomnia, prior to March 24, 2014, have been met. 38 U.S.C.A. §§ 1155, 5107(b) (West 2014); 38 C.F.R. §§ 4.7, 4.31, 4.124, 4.124(a), Diagnostic Codes 8108-8911 (2015).

2. The criteria for an increased rating in excess of 80 percent for hypersomnia have not been met. 38 U.S.C.A. §§ 1155, 5107(b) (West 2014); 38 C.F.R. §§ 4.7, 4.31, 4.124, 4.124(a), Diagnostic Codes 8108-8911 (2015).

3. The criteria for TDIU have not been met. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.340, 4.16 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Duties to Notify and Assist

Upon receipt of a substantially complete application, VA must notify the claimant and any representative of any information, medical evidence, or lay evidence not previously provided to VA that is necessary to substantiate the claim. The notice must: (1) inform the claimant about the information and evidence not of record that is necessary to substantiate the claim; (2) inform the claimant about the information and evidence that VA will seek to provide; and (3) inform the claimant about the information and evidence the claimant is expected to provide. 38 U.S.C.A. §§ 5103, 5103A, 5107 (West 2002 & Supp. 2012); 38 C.F.R. § 3.159 (2012); Pelegrini v. Principi, 18 Vet. App. 112 (2004). If VA does not provide adequate notice of any of element necessary to substantiate the claim, or there is any deficiency in the timing of the notice, the burden is on the claimant to show that prejudice resulted from any notice error. Shinseki v. Sanders, 129 S.Ct. 1696 (2009). 

The Board finds that any defect with regard to the timing or content of the notice to the appellant is harmless because of the thorough and informative notices provided throughout the adjudication and because the appellant had a meaningful opportunity to participate effectively in the processing of the claim with an adjudication of the claim by the RO subsequent to receipt of the required notice. The record does not show prejudice to the appellant, and the Board finds that any defect in the timing or content of the notices has not affected the fairness of the adjudication. Mayfield v. Nicholson, 19 Vet. App. 103 (2005); Dingess v. Nicholson, 19 Vet. App. 473 (2006). Specifically, the Veteran was notified in a letter dated in August 2006.

The Veteran has neither alleged nor demonstrated any prejudice with regard to the content or timing of the notice provided. Shinseki v. Sanders, 129 S. Ct. 1696 (2009) (burden of showing an error is harmful or prejudicial falls on party attacking agency decision); Mayfield v. Nicholson, 444 F.3d 1328 (Fed. Cir. 2006). The Board considers it significant that the subsequent statements made by the Veteran and representative suggest actual knowledge of the elements necessary to substantiate the claim. Dalton v. Nicholson, 21 Vet. App. 23 (2007) (actual knowledge is established by statements or actions by claimant or representative that demonstrate awareness of what is necessary to substantiate claim). 

Thus, VA has satisfied its duty to notify the appellant and had satisfied that duty prior to the adjudication in the January 2016 supplemental statement of the case. Overton v. Nicholson, 20 Vet. App. 427 (2006) (Veteran afforded a meaningful opportunity to participate effectively in adjudication of claim, and therefore notice error was harmless). 

The Board also finds that the duty to assist requirements have been fulfilled. All relevant, identified, and available evidence has been obtained, and VA has notified the appellant of any evidence that could not be obtained. The appellant has not referred to any additional, unobtained, relevant, available evidence. VA has obtained an examination with respect to the claim. Thus, the Board finds that VA has satisfied the duty to assist. No further notice or assistance to the Veteran is required to fulfill VA's duty to assist in development. Smith v. Gober, 14 Vet. App. 227 (2000); Dela Cruz v. Principi, 15 Vet. App. 143 (2001); Quartuccio v. Principi, 16 Vet. App. 183 (2002).

Disability ratings are determined by the application of the VA's Schedule for Rating Disabilities. 38 C.F.R. Part 4 (2015). The percentage ratings contained in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during service and their residual conditions in civil occupations. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. §§ 3.321(a), 4.1 (2015).

It is not expected, especially with the more fully described grades of disabilities, that all cases will show all the findings specified. Findings sufficiently characteristic to identify the disease and the disability therefrom are sufficient; and above all, a coordination of rating with impairment of function will be expected in all cases. 38 C.F.R. § 4.21 (2015).

Where there is a question as to which of two ratings shall be applied, the higher rating will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2015).

The rating of the same disability under various diagnoses is to be avoided. 38 C.F.R. § 4.14 (2015). However, that does not preclude the assignment of separate ratings for separate and distinct symptomatology where none of the symptomatology justifying a rating under one diagnostic code is duplicative of or overlapping with the symptomatology justifying a rating under another diagnostic code. Esteban v. Brown, 6 Vet. App. 259 (1994).

Hypersomnia

The Veteran claims that his hypersomnia is more severe than the current ratings. Specifically, the Veteran notes that his condition has not improved since he was initially service-connected, and that he has multiple daily episodes or attacks of sleepiness and must take naps throughout the day. The Board finds that a review of the medical evidence of record and lay statements from the Veteran and his friends and family, shows that the Veteran experiences, on average, 10 attacks a week which require him to take naps. The Board finds that those required naps are analogous to minor seizure under the appropriate Diagnostic Code, and therefore, warrant a higher rating of 80 percent. Therefore, the Veteran's claim for a higher rating must be granted. 

The Veteran's condition is currently rated under Diagnostic Code 8108-8911 for hypersomnia. Hyphenated diagnostic codes are used when a rating under one diagnostic code requires use of an additional diagnostic code to identify the basis for the evaluation assigned; the additional code is shown after the hyphen. 38 C.F.R. § 4.27 (2015). Diagnostic Code 8108 pertains to narcolepsy, which is to be rated as epilepsy, petit mal. 38 C.F.R. § 4.124a, Diagnostic Code 8108 (2015). Diagnostic Code 8911 pertains to epilepsy, petit mal. 38 C.F.R. § 4.124a, Diagnostic Code 8911 (2015). 

The Rating Schedule does not contain a specific diagnostic code for hypersomnia. However, where an unlisted condition is encountered it is permissible to rate it under a closely related disease or injury, in which not only the functions affected, but the anatomical localization and symptomatology are closely analogous. 38 C.F.R. § 4.20 (2015). In this case, the Board finds that Diagnostic Code 8108, which pertains to narcolepsy and directs the rater to rate the disability as petit mal epilepsy under Diagnostic Code 8911, is the most closely analogous diagnostic code. 38 C.F.R. § 4.84 (2015). 

Under Diagnostic Code 8911, for petit mal epilepsy, both the frequency and type of seizures a Veteran experiences are considered in determining the appropriate rating. A major seizure is characterized by generalized tonic-clonic convulsion with unconsciousness. A minor seizure consists of a brief interruption in consciousness or conscious control associated with staring or rhythmic blinking of the eyes or nodding of the head (pure petit mal), or sudden jerking movements of the arms, trunk, or head (myoclonic type) or sudden loss of postural control (akinetic type). 38 C.F.R. § 4.124a (2015). 

To warrant a rating the seizures must be witnessed or verified at some time by a physician, and regarding the frequency of epileptiform attacks, competent, consistent lay testimony emphasizing convulsive and immediate post-convulsive characteristics may be accepted. It is also provided that the frequency of seizures should be ascertained under the ordinary conditions of life while not hospitalized. 38 C.F.R. § 4.121 (2015).

Under the general formula for major and minor epileptic seizures, both the frequency and type of seizure a Veteran experiences are considered in determining the appropriate rating. A 60 percent rating is assigned when there is an average of at least one major seizure in four months over the last year; or nine to 10 minor seizures per week. An 80 percent rating is assigned when there is an average of at least one major seizure in three months over the last year; or more than 10 minor seizures weekly. A 100 percent rating is warranted when there is an average of one major seizure per month over the last year. 38 C.F.R. § 4.124a, Diagnostic Code 8911 (2015). 

When continuous medication is shown necessary for the control of epilepsy, the minimum rating will be 10 percent. This rating will not be combined with any other rating for epilepsy. In the presence of major and minor seizures, the predominating type of epilepsy is to be rated. There will be no distinction between diurnal and nocturnal major seizures. 38 C.F.R. § 4.124a, General Rating Formula for Major and Minor Epileptic Seizures, Notes (1)-(3) (2015). 

As a preliminary matter, the Board notes that during the most recent VA examination in January 2015, the VA examiner opined that the Veteran's excessive drowsiness, alleviated by a power nap, is analogous to the sleep attacks rated as petit mal seizures under the criteria for epileptic seizures. 38 C.F.R. § 4.124a, Diagnostic Code 8911 (2015). Accordingly, the Veteran's need for naps throughout the day are considered analogous to minor seizures under the rating schedule. The examiner noted that those attacks are not considered major seizures as they do not involve convulsions. 

The Boards notes that a review of the claims file and medical history shows that the Veteran has required more than a few naps on a daily basis since the inception of the claim for an increased rating. A review of the treatment records, to include several VA examinations, and lay statements from the Veteran, shows that the competent evidence of record verifies that the Veteran experiences, on average, more than 10 minor seizures of hypersomnia, weekly, which warrants the next higher rating of 80 percent under the Diagnostic Code for rating petit mal epilepsies. 38 C.F.R. §§ 4.121, 4.124a, Diagnostic Code 8911 (2015).

In a June 3, 2004, VA medical report, the Veteran reported that his symptoms had worsened because he felt more tired lately and was falling asleep more easily at his job, especially when his work was finished and he had some down time. His medications were increased. VA medical records dated from July 2004 to February 2005 show that the Veteran requested a medical letter to his employer in July 2004 explaining his condition and assistance in applying for Family Medical Leave in September 2004 for times when he was unable to go to work due to hypersomnolence. The Veteran complained that he continued to fall asleep at work while doing paperwork. An April 2005 letter from the Veteran's treating VA physicians indicated that despite being on medication, the Veteran still required two to three naps at work each day and a nap when he got sleepy on the drive back from work. He was also noted to need to take a three to four hour nap on his first day off from work. The Veteran was found to struggle to maintain wakefulness both at work and home despite being on medication. 

On VA examination in October 2005, the Veteran reported having worked as an airline mechanic for the same company for the previous five years. He stated that he was doing fine at work except for in June 2004 when he fell asleep and missed an important deadline, causing him to nearly get fired. He maintained that since September 2004, he had increased his medication both prior to and after work so that he was safe to drive. 

At a March 2006 VA examination, the Veteran described a typical narcoleptic attack as one where he fell asleep very easily, often at inappropriate times. He stated that the sleep was evoked by lack of sleep or inactivity. He reported experiencing 100 attacks in the previous two years and averaging four attacks per month. He complained of frequently falling asleep while sitting in church, reading, or watching television. He maintained that he often had to pull over while driving in order to take a nap. He stated that he had not fallen asleep while driving but that he had to take naps at work. He complained that the symptoms occurred intermittently as often as daily with each occurrence lasting for 30 minutes. The examiner found that the Veteran's ability to perform daily functions during flare-ups was significantly impaired. The examiner noted that the Veteran was functionally impaired by sometimes oversleeping and missing work and that because he sometimes had to stop while driving, he would be late to work or other appointments. The examiner stated that the Veteran's narcolepsy had resulted in him missing work eight times per year. Neurological examination of the Veteran's upper and lower extremities was within normal limits. 

In a May 2006 letter, the Veteran's treating VA physicians reported that the Veteran continued to have uncontrolled sleep episodes despite being on two different medications to control hypersomnia. The physicians stated that the Veteran was fortunately in a van pool to get to work, where he drove his own vehicle 32 miles to get to the van and then traveled the remaining 33 miles in the van. The Veteran reported that he still fell asleep up to a few times a day, including in church every Sunday, in the van going to work at least twice a week, and in the van on the way home from work every day. The Veteran stated that because he was able to sleep in the van, he was able to stay awake when he drove himself home and avoid taking as much Ritalin to stay awake as he did when he was driving the entire way to the airport. On a typical work day, the Veteran took a Modafinil pill when he arrived at work and then napped during his meal break. He overslept during his meal break about once a week. He took one to two Ritalin pills on his days off and one Ritalin pill on his work days. He took two to four Ritalin pills if he worked overtime. The Veteran had to call in sick about 12 times in the past year due to sleepiness. On the Veteran's days off, he had to shift his sleep cycle from daytime sleeping to nighttime sleeping in order to see his family, and that contributed to his sleep problems. He thereafter fell asleep three to four times a day on his days off. The physicians concluded that the Veteran continued to struggle to maintain wakefulness both at work and home despite his medication. 

A July 2006 statement from the Veteran's technical training instructor at work indicated that the Veteran was an airframe and power plant certified technician with Alaska Airlines and that he would have worked at the company for six years at the end of October 2006. The instructor reported that during the classroom portion of the qualification training for engine run and taxi procedures, he had observed the Veteran having difficulty staying alert. He stated that he had been made aware that the Veteran was being treated for a sleep disorder and that due to the inherent risks in engine run and taxi procedures, it had been determined that the Veteran would not be qualified for those responsibilities. 

At a July 2006 pre-determination hearing, the Veteran testified that his narcoleptic episodes occurred every day. He testified that he participated in a van pool to and from work and that he fell asleep in the van both to and from work. He reported that due to being able to nap in the van, he was usually able to stay awake for the drive home although he sometimes had to keep himself awake by turning up the music very loud, rolling down the windows, or slapping his face. He stated that he had to pull over to the side of the road to take a nap quite frequently, especially if he worked overtime. He maintained that if he was in a situation where he felt comfortable, he would often fall asleep without realizing it. He testified that once at work, he did not go out to work on his airplane when it had arrived because he had fallen asleep for four hours. He reported that due to his sleepiness, he had also been in several car accidents where he ran into a freeway barrier and a tree. He stated that before the van pool, he had to pull over and stop driving at least 50 percent of the time. He maintained that he took two different types of medications, one that was long-term and another that was more short-term. The Veteran's wife testified that over the course of the previous month, the Veteran had probably fallen asleep in the middle of a conversation about 20 to 30 times. She reported that he fell asleep in church every week. She stated that she had to do most of the driving if they were in the car together because otherwise, he fell asleep while driving. 

Post-service VA and private medical records dated from 2005 to the present show that the Veteran received intermittent treatment for hypersomnia. His condition was noted by treating providers to be severe, and required multiple daily naps and frequent daily attacks of excessive sleepiness. In May 2006, a VA treating physician found that the Veteran's daytime sleepiness was unchanged from before, as he continued to require multiple daily naps. The evidence showed that despite taking medication before work, during his shift, and before driving home from work, the Veteran still had to pull over while driving and take a nap. In a September 2007 VA treatment report, it was noted that the Veteran was taking up to seven or eight pills of Ritalin in addition to two pills of Modafinil a day in order to control narcolepsy and that his disability was thus found to be poorly controlled. A March 2009 VA treatment report found that there had been no change in the Veteran's narcolepsy symptoms. The Veteran reported still having to pull over to nap once or twice just while driving to and from work. 

On VA examination in May 2010, the Veteran described a typical narcoleptic attack as being one where he became drowsy and found it hard to keep his eyes open. He reported that during the past two years, he had experienced 800 attacks and averaged 30 attacks each month. He complained that he was functionally impaired due to the disability because he was unable to perform all of the duties of his employment, including engine run and taxiing of aircraft. He also maintained that his commute to and from work required him to pull over several times to take naps. 

In October 2010, the Veteran presented testimony at hearing before the undersigned. The Veteran again noted an inability to stay awake at work or on the commute to and from work. Specifically, he stated that he sometimes had to pull over during the commute to nap prior to finishing the commute home, and noted that when he was a part of a van pool to work, he fell asleep almost every day while riding the van to work. He also noted that he often fell asleep a few times a shift at work, and took several naps during the day when he was not working. 

In September 2012, the Veteran submitted lay statements from his co-workers at the airline. Those letters, in essence, noted that Veteran's trouble staying awake at work on a daily basis. In those statements, his co-workers, who both consider themselves close to the Veteran, noted that the Veteran fell asleep on a daily basis at work. In a March 2014 statement, the Veteran stated that he fell asleep on the job several times every shift, and that in addition to having to pull over on his commute to and from work, he also scheduled at least two naps per shift. 

At a January 2015 VA examination, the Veteran again noted his inability to stay awake at work, and during the day, which required him to take several naps throughout the day on a daily basis. The examiner found that those required naps, or attacks of hypersomnia or sleepiness, were equivalent to petit mal seizures. The examiner noted that since the Veteran seemed to require 3 to 4 power naps on a daily basis that his condition was equitant to an average of 10 minor seizures weekly. The examiner found that without evidence of convulsions, there was no evidence of the Veteran had episodes equivalent to major seizures. 

Under the rating schedule, an 80 percent rating is warranted when the disability causes, at least, 10 minor seizures weekly, or at least one major seizure in the last three months. Here, the Board finds that throughout the claims period, there is ample evidence that the Veteran has experienced approximately 10 or more episodes that are equivalent to minor seizures per week. Specifically, both the competent medical evidence of record, and the lay statements have consistently found that the Veteran had several minor seizures, or required naps, each day throughout the day. The Veteran has testified consistently that he has to schedule or falls asleep several times each shift, not to include stopping to nap while driving to and from work. The Board finds those statements to be both competent and credible as the Veteran as a lay person can competently speak to extreme drowsiness that requires a nap. 

The Board acknowledges that there is evidence of record that shows that the Veteran did not suffer over 10 minor seizures weekly. Specifically, during the May 2010 examination, he reported 800 attacks in two years, or less than 8 attacks weekly, on average. The Board notes that those figures must be considered as only an estimation of the number of attacks the Veteran had throughout that period, and cannot be construed as an exact count of actual experiences. Just a few months later during a pre-determination hearing in October 2010, the Veteran noted falling asleep daily at work and during his commute, or at least twice a day. The Board therefore finds that such estimated number of attacks in that particular instance do not indicate a change in condition justifying a change in rating.

Therefore, resolving all reasonable doubt in favor of the Veteran, the Board finds that the evidence is in favor of a higher rating of 80 percent, but not higher, during the period under appeal. The Board finds that the evidence of record demonstrates that the Veteran has 10 or more attacks that are the equivalent of minor seizures weekly, these attacks of hypersomnia requires him to nap daily, and that the condition has been ongoing since the inception of this claim. Therefore, the claim for an increased rating of 80 percent is warranted for throughout the claims period. 

The Board finds that a rating of 100 percent is not warranted for the disability at any point of the claims period, as the Veteran's does not experience convulsive seizures, and therefore, the attacks cannot be considered major seizures under the Diagnostic Code. 38 C.F.R. § 4.124a, Diagnostic Code 8911 (2015). The VA examiner has found that the attacks are equivalent to minor seizures and not major seizures because they do not involve convulsions. Accordingly, the Board finds that a rating of 100 percent, which requires at least one major seizure monthly, is not warranted. 

The Board has also considered the applicability of other applicable Diagnostic Codes to include 6354 for Chronic Fatigue Syndrome. However, that Diagnostic Code would not yield a higher rating as a 100 percent rating under that Code requires debilitating symptoms which are not only nearly constant, but also so severe as to restrict routine of daily activities almost completely, and which may occasionally precludes self-care. Here, while the Veteran's has the need of a nap throughout the day, there is no evidence that he cannot take care of himself, or that it restricts routine daily activities. He remains employed and drives to work daily, and adequately works at a major airline. Therefore, his condition cannot be considered restrictive of routine daily activities. Therefore, the Board finds that a higher rating cannot be assigned applying Diagnostic Code 6354. 

Additionally, the Board finds the evidence does not show that the Veteran's service-connected hypersomnia presents such an unusual or exceptional disability picture at any time so as to require consideration of an extra-schedular rating. 38 C.F.R. § 3.321(b)(1) (2015). The objective medical evidence of record shows that manifestations of the Veteran's service-connected hypersomnia do not result in a marked functional impairment to a degree other than that addressed by VA's Rating Schedule. The schedular rating criteria are designed to compensate for average impairments in earning capacity resulting from service-connected disability in civil occupations. 38 U.S.C.A. § 1155 (West 2014). Generally, the degrees of disability specified in the rating schedule are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability. 38 C.F.R. § 4.1 (2015). The Board finds that the evidence does not show frequent hospitalization due to his hypersomnia.

Furthermore, the Board finds that the evidence does not show marked interference with employment beyond that envisioned by the schedular rating already assigned. While the Board acknowledges that the Veteran's disability interferes with his employment to some degree, the interference primarily relates to the Veteran's ability to be promoted and occasional absences. The Veteran may be prevented from being engine room qualified and taxi qualified, but he is still able to perform his job with employer accommodations and help from co-workers. The Veteran has also reported missing work around eight to 12 times a year due to his disability, but the Board finds that the Veteran's current degree of disability as specified in the rating schedule adequately compensates him for that loss of working time. Consequently, the Board concludes that referral of this case for consideration of an extra-schedular rating is not warranted. Thun v. Peake, 22 Vet. App. 111 (2008); Bagwell v. Brown, 9 Vet. App. 337 (1996); Floyd v. Brown, 9 Vet. App. 88 (1996). 

TDIU

A total rating for compensation may be assigned where the schedular rating is less than total when it is found that the disabled person is unable to secure or follow a substantially gainful occupation as a result of a single service-connected disability ratable at 60 percent or more or as a result of two or more disabilities, provided at least one disability is ratable at 40 percent or more, and there is sufficient additional service-connected disability to bring the combined rating to 70 percent or more. For the above purpose of one 60 percent disability, or one 40 percent disability in combination, the following will be considered as one disability: (1) Disabilities of one or both upper extremities, or of one or both lower extremities, including the bilateral factor, if applicable, (2) Disabilities resulting from common etiology or a single accident, (3) Disabilities affecting a single body system, e.g. orthopedic, digestive, respiratory, cardiovascular-renal, neuropsychiatric, (4) Multiple injuries incurred in action, or (5) Multiple disabilities incurred as a prisoner of war. 38 C.F.R. § 4.16(a) (2015).

The existence or degree of nonservice-connected disabilities or previous unemployability status will be disregarded where the required percentages for the service-connected disability or disabilities are met and in the judgment of the rating agency the service-connected disabilities make the veteran unemployable. Marginal employment shall not be considered substantially gainful employment. Marginal employment generally shall be deemed to exist when a Veteran's earned annual income does not exceed the amount established by the United States Department of Commerce, Bureau of the Census, as the poverty threshold for one person. Marginal employment may also be held to exist, on a facts found basis (includes but is not limited to employment in a protected environment such as a family business or sheltered workshop), when earned annual income exceeds the poverty threshold. 38 C.F.R. § 4.16(a) (2015). 

It is the established policy of VA that all Veterans who are unable to secure and follow a substantially gainful occupation by reason of service-connected disabilities shall be rated totally disabled. Rating boards are to refer to the Director of the Compensation Service for consideration all cases of Veterans who are unemployable by reason of service-connected disabilities but who fail to meet the percentage requirements. 38 C.F.R. § 4.16(b) (2015).

Total disability will be considered to exist when there is present any impairment of mind or body which is sufficient to render it impossible for the average person to follow a substantially gainful occupation. 38 C.F.R. § 3.340(a) (2015). A Veteran's service-connected disabilities, employment history, educational and vocational attainment, and all other factors having a bearing on the issue must be addressed. Age may not be considered as a factor in evaluating service-connected disability; and unemployability, in service-connected claims, associated with advancing age or intercurrent disability, may not be used as a basis for a total disability rating. 38 C.F.R. § 4.19 (2015).

The sole fact that a claimant is unemployed or has difficulty obtaining employment is not enough. A high rating in itself is a recognition that the impairment makes it difficult to obtain and keep employment. The question is whether the Veteran is capable of performing the physical and mental acts required by employment, not whether the veteran can find employment. Van Hoose v. Brown, 4 Vet. App. 361 (1993). 

As a preliminary matter, the Board notes that the Veteran meets the percentage criteria for consideration for a TDIU on a schedular basis, as he has been assigned an 80 percent rating for hypersomnia. The Board, however, finds that the Veteran is not currently unemployed. The evidence of record shows that he remains employed as a mechanic full-time at a major airline company, earning over the national poverty threshold. While the Veteran does not contend he is currently unemployed, he asserts that he warrants TDIU because his current workplace is a sheltered workplace and should be considered marginal employment. 38 C.F.R. § 4.16(a) (2015). Specifically, the Veteran claims that because of his union and the accommodations his supervisors and the airlines have made for his service-connected hypersomnia, that he is essentially in a sheltered workplace where he cannot get fired based on his disability, but he can also not be promoted. Additionally, the Veteran claims that if he leaves that airline, that he would not be employable due to his service-connected disability. 

The Board acknowledges the Veteran's assertions that his company has provided a great deal of accommodation with regards to his disability. Specifically, the Veteran has noted that his supervisors have given him a wide-berth with regard to falling asleep at work, and have developed special procedures for his condition, to include having other supervisors and employees keep track of him and to wake him when he need to do work. The Veteran and representative claims that but for those accommodations the Veteran would no longer be employed at the airline, and therefore, the company must be considered a sheltered workplace that has offered him a protected environment. Therefore, the Veteran argues, a TDIU is warranted. 

In a November 2012 Individual Unemployability Assessment from a private vocational expert, the consultant opined that the Veteran's work situation at the airline was essentially a sheltered workplace, and that but for the accommodations provided by the airline, his union, and his supporting supervisors, that the Veteran would not be able to secure or follow any other substantially gainful employment due to the service-connected disability. 

In a January 2015 VA examination, the examiner opined that the Veteran's current employment was not marginal in nature or a sheltered workplace or a protected environment. The examiner noted that not only was the Veteran an FAA certified mechanic at a major airline, and that employer did not operate as a sheltered workshop environment, especially in occupational capacities that affect flight safety. While the examiner recognized that Veteran's limited promotional potential, the examiner nonetheless concluded that the work conditions did not amount to a sheltered workplace, or marginal employment. 

The Board notes that the term sheltered workshop is not defined in the regulation applicable to TDIU. However, the Board observes that the Wage and Hour Division of the United States Department of Labor uses the terms "sheltered workshop" and work center interchangeably to mean a place that has "historically provided rehabilitation services, day treatment, training, and/or employment opportunities to individuals with disabilities." Sheltered Workshop, Department of Labor, Wage & Hour Division, Field Operations Handbook, available at http://www.dol.gov/whd/FOH/ch64/64k00.htm (last accessed June 28, 2016).

Here, the Board finds that the preponderance of evidence is against demonstrating that the Veteran's current workplace is a sheltered work environment as envisioned by VA regulations. Specifically, the Veteran currently works for a major airlines, and is paid $32 an hour, well over the national poverty threshold, as he works full-time. While the airline has provided the Veteran with many accommodations with regard to required naps and hypersomnia symptoms, there is no evidence that the airline has historically been a place that provides rehabilitation services for people with disabilities. In fact, that airline attempted to dismiss the Veteran for his chronic inability to stay awake at work. The Board finds that the fact that a union had to intervene to protect the Veteran's employment, and his accommodations, under federal law, the Americans with Disabilities Act, strengthens the argument that the Veteran's place of employment is not considered a sheltered workplace. The Veteran retained his employment as a result of accommodations required by law and action by his union. Therefore, the Board finds that the workplace is not a sheltered environment, but compliant with prevailing law regarding accommodation for disabilities.

The Board notes even considering the wording in the regulation itself under 38 C.F.R. § 4.16(a), goes against any interpretation that the Veteran's current employment is marginal. The term sheltered workshop is placed in the same category as a family business, as examples of a marginal employment or protected environment. The Board finds that the juxtaposition of those terms demonstrates the spirit of that exception contemplates an employment situation more akin to what is offered by a family business, and not, as it is here, winning a labor dispute against a major corporation to retain one's employment, with accommodations.

The Board ultimately finds that the Veteran's current employment situation with the airline does not constitute as marginal employment, such as in a protected environment analogues to a sheltered workshop or a family business. While the Board recognizes that there are both positive and negative vocational opinions regarding whether that situation constitutes as a sheltered workplace, the applicable regulations place responsibility for the ultimate TDIU determination on the VA adjudicator, not a medical or vocational examiner. Geib v. Shinseki, 733 F.3d 1350, 1354 (Fed.Cir.2013).

The Board finds that the preponderance of evidence is against the finding that the Veteran's current employment with the airline as a sheltered environment. The Veteran's employment situations falls outside the spirit of what the regulation for a TDIU contemplates when referring to marginal employment, and therefore, his claim for a TDIU based on his service-connected disability must be denied because the preponderance of the evidence is against a finding that the service-connected disabilities make him unable to secure or follow a substantially gainful occupation. Gilbert v. Derwinski, 1 Vet. App. 49 (1990); 38 U.S.C.A. § 5107 (West 2014); 38 C.F.R. § 3.102 (2015). 

ORDER

Entitlement to a rating of 80 percent, but not higher, for hypersomnia prior to March 24, 2014, is granted. 

Entitlement to a rating in excess of 80 percent for hypersomnia is denied. 

Entitlement to TDIU is denied. 

REMAND

The Board finds that additional development is required for the claim for service connection for sleep apnea. Although the Board sincerely regrets the additional delay, it is necessary to ensure that there is a complete record upon which to decide the claim. 

With regard to the claim for service connection for sleep apnea, the Veteran was provided VA examinations in May 2010 and July 2015, to assess the nature and etiology of the sleep apnea. After a review of the opinions, the Board finds that both opinions to be incomplete. Specifically, the Board finds that while both examinations addressed secondary causation or aggravation of sleep apnea as it relates to service-connected hypersomnia, no medical opinion spoke to the etiology of sleep apnea directly to service. The Board notes that prior to exiting service, the Veteran's service medical records showed the Veteran with symptoms such as daytime sleepiness and snoring at night. While the Veteran was ultimately diagnosed with hypersomnia, those symptoms are akin to those related to sleep apnea, and as those symptoms in service should be addressed with regard to their potential direct relation to any current sleep apnea. While the Board acknowledges that the Veteran has not explicitly claimed a direct etiology of sleep apnea, the Board finds nonetheless that it is the VA's duty to exhaust all paths of entitlement for claim for service connection. Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994).

The Board notes that the VA's statutory duty to assist the Veteran includes the duty to conduct a thorough examination so that the evaluation of the claimed disability will be a fully informed one. Green v. Derwinski, 1 Vet. App. 121 (1991); Snuffer v. Gober, 10 Vet. App. 400 (1997). Assistance by VA includes providing a medical examination or obtaining a medical opinion when such an examination or opinion is necessary to make a decision on a claim. 38 U.S.C.A. § 5103A(d) (West 2014); 38 C.F.R. § 3.159(c)(4) (2015); McLendon v. Nicholson, 20 Vet. App. 79 (2006). However, if the VA provide an examination, that examination must be adequate. When the medical evidence is incomplete, VA must supplement the record by seeking an opinion or ordering another medical examination. Colvin v. Derwinski, 1 Vet. App. 171 (1991); Hatlestad v. Derwinski, 3 Vet. App. 213 (1992). 
Accordingly, the case is REMANDED for the following action:

1. Obtain any VA treatment records that are not already of record. Any negative responses should be associated with the claims file. 

2. Then, schedule the Veteran for a VA examination with a medical doctor regarding the etiology of sleep apnea. The examiner must review the claim file and should note that review in the report. Any testing deemed necessary should be performed. A complete rationale for any opinion expressed should be included in the examination report. The examiner should opine whether it is at least as likely as not (50 percent or greater probability) that sleep apnea is related to service, to include complaints of snoring and sleep disturbance during service. The examiner should opine whether it is at least as likely as not (50 percent or greater probability) that sleep apnea is was caused by service-connected idiopathic central nervous system hyper-somnolence syndrome. The examiner should opine whether it is at least as likely as not (50 percent or greater probability) that sleep apnea is has been aggravated (permanently increased in severity beyond the natural progress of the disorder) by idiopathic central nervous system hyper-somnolence syndrome. 

3. Then, readjudicate the claims. If any decision is adverse to the Veteran, issue a supplemental statement of the case and allow the applicable time for response. Then, return the case to the Board.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board or the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
Harvey P. Roberts
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs